# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH R. HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:09cv1046 CAS |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Joseph R.

Higgins (Plaintiff) disability insurance benefits (DIB) under Title II of the Social Security Act

(the Act), 42 U.S.C. § 401-433, and supplemental security income (SSI), under Title XVI of

the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of his complaint; the

Commissioner has filed a brief in support of his answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB and SSI in June 2005, alleging that he was disabled as of

April 29, 2005, by third degree burns over 56% of his body. (R.[1] at 46-48, 93-95.) His

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

application was denied initially and after a hearing held before Administrative Law Judge (ALJ) James B. Griffith in November 2006 and a supplemental hearing held in June 2007. (Id. at 8-21, 40-45, 50, 87-91, 258-319.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony and Interrogatories Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the first hearing.

Plaintiff, 37 years old at the time of the hearing, testified that he had completed the eleventh grade and would soon be taking the General Equivalency Degree (GED) exam. (Id. at 281, 286.) He had taken the GED exam before but had not passed the writing portion. (Id. at 286.) He takes GED classes four days a week and has since March. (Id.) When he was in school, he had not been in any special education classes. (Id. at 286-87.) He lives with his parents in a two-story house, is single, and has a seventeen-year old child. (Id. at 282, 311.) He last had a valid driver's license in June 2001. (Id. at 283.)

He last worked in January 2005. (Id.) He was then working laying carpet and was laid off when his employer no longer had any work. (Id. at 283, 287.) When doing this job, he regularly had to lift between 100 and 300 pounds and constantly had to kneel. (Id. at 287.) He has also done iron and metal work. (Id. at 283.) He last did this type of work in 2003, manufacturing rails for a car wash machine to ride on. (Id. at 283, 288.) This job was indoor and required that he carry large pipes. (Id. at 288.) He did not work in 2001 and 2002. (Id. at 287.) He had also worked as an iron worker in 1998, but was laid off. (Id. at 289.)

He cannot work now because he cannot be in the sunlight or heat. (<u>Id.</u> at 284.) Also, he has trouble with his left leg tightening up on him, his torso being tender and stiff, his left hand cramping, and his right hand becoming numb. (<u>Id.</u>) He can move better than he did in September 2005, but he is still not good. (<u>Id.</u>) His current primary impetus to working is the heat. (<u>Id.</u> at 285.) Sunlight and heat higher than 65 degrees cause profuse sweating. (<u>Id.</u> at 285, 301.) He cannot sweat out of 56% of his body. (<u>Id.</u>) The sunlight and heat also make him nauseous and light-headed. (<u>Id.</u> at 301.) He then has to get to a cool place and sit down. (<u>Id.</u>) Walking or doing yard work, e.g., mowing the grass, causes profuse sweating. (<u>Id.</u> at 302, 311.) If he starts sweating, he has to stop for at least fifteen minutes, get to a cool spot, and have something to drink. (<u>Id.</u> at 302.)

The only medication Plaintiff takes is over-the-counter ibuprofen and Tums for heartburn. (<u>Id.</u> at 285.) He takes four ibuprofen pills a day. (<u>Id.</u> at 309.) He is not regularly seeing a medical professional. (<u>Id.</u> at 285.) He last saw Dr. Smith four months ago for headaches. (<u>Id.</u>) The headaches last for four to six hours, feel like there are sharp needles in his head, and are accompanied by nausea. (<u>Id.</u> at 307-08.) The headaches are partially relieved by the ibuprofen. (<u>Id.</u> at 308.) He has to sit down when he has a headache. (<u>Id.</u>) The visit to Dr. Smith is the only medical treatment he has had in the past year. (<u>Id.</u> at 286.)

Plaintiff testified that on April 29, 2005, his entire chest, half of his back, his entire left leg except for the thigh, half his right leg, the top of his left hand, two fingers on his right hand, his neck, and the side of his face were burned. (<u>Id.</u> at 289-91.) He underwent five skin grafts. (<u>Id.</u> at 291, 302.) The grafted skin constricts his movements; consequently, he gets

"real stiff" and does thirty to sixty minutes of exercise each morning.  (Id. at 291-92.)  In total, 56% of his body was burned.  (Id. at 291.)  The grafted skin on his chest constricts his breathing, causing him to be short of breath if he climbs stairs or walks up a hill.  (Id. at 310.)

His left leg hurts when he walks.  (Id. at 292.)  He can only walk a block to a block and a half before having to stop and rest for at least fifteen minutes.  (Id.)  If he stands for longer than a minute or two, his left leg feels like needles are being stuck in it.  (Id.)  To relieve this sensation, he has to start walking or sit down for approximately one minute.  (Id.)  He has the same sensation on his chest, but not as frequently.  (Id. at 293.)  He cannot sit for longer than fifteen to twenty minutes before having to get up and move because his leg stiffens up.  (Id.)  His left hand is "extremely tight," preventing him from moving his thumb completely over his hand.  (Id.)  His grip is not good.  (Id.)  It feels like he has arthritis in all his fingers; it is "[m]ildly painful."  (Id. at 294.)  His ability to lift is limited because the grip strength in his left hand is three-quarters of what it used to be.  (Id.)  His fine motor movements seem to be okay; for instance, he can button buttons.  (Id.)  Doing such movements does require more concentration.  (Id. at 295.)  He can pick up small objects.  (Id. at 300.)

Plaintiff had carpal tunnel release surgery in his left hand the previous November.  (Id. at 295.)  Prior to the surgery, he had no feeling in his left index and middle fingers and his left thumb.  (Id. at 296.)  He has a lot of, but not all, feeling back in his fingers after the surgery.  (Id. at 297.)  He still has joint pain and a little numbness in his thumb and the two fingers.  (Id.)  Also, his right hand goes numb if he uses it.  (Id. at 299.)  He is right-handed.  (Id.)  He does not have any problems carrying eight pounds or groceries if he holds them on his arm

and not in his hand.  (Id. at 300.)  The symptoms in his right hand have increased since November 2005.  (Id. at 313.)

Plaintiff did not have any insurance when he was burned.  (Id. at 298.)  He has since received Medicaid.  (Id.)

Plaintiff was given Lexapro for depression.  (Id. at 303.)  He felt suicidal because of his burns and appearance.  (Id.)  He had to stop taking the Lexapro when his insurance would no longer cover it and he could not otherwise afford it.  (Id.)  Now, he has no motivation to do anything.  (Id.)  He stays at home, sleeps, and watches television.  (Id. at 303-04.)  Two or three times a week he does not get out of bed.  (Id. at 306.)  Goodwill has signed him up for a computer course and training program pending the outcome of his SSI and DIB applications.  (Id. at 304-05.)  Goodwill recommended he get his GED before starting the program.  (Id.)

His doctor told him he could not work for a year after being burned.  (Id. at 305, 306.)

Plaintiff does some housework, e.g., washing dishes, doing the laundry, and vacuuming.  (Id. at 311.)  The laundry causes a problem because the machines are in the basement and he gets a little winded carrying the basket down.  (Id.)

Plaintiff is easily distracted.  (Id. at 312.)  His son has been diagnosed with attention deficit disorder, and Plaintiff thinks he has it too because it is inherited and he has always had a short attention span.  (Id. at 312-13.)  He can concentrate on something for fifteen to twenty minutes before becoming distracted.  (Id. at 313.)

Asked to describe a typical day, Plaintiff testified that on good days he gets up at approximately 8 o'clock in the morning.  (Id. at 314.)  After taking four ibuprofen, he helps his mother with the housework and tries to do the yard work if it needs to be done.  (Id.)  On bad days, he stays in bed.  (Id.)  On Sundays, he goes to church with his mother.  (Id.)  If the temperature in the church is too hot, he has to leave.  (Id.)  He attends GED classes.  (Id. at 315.)  He watches car races on television "[a]ll the time" and plays cards with the neighbors once or twice a week.  (Id.)  He used to enjoy playing softball, but no longer can.  (Id.)  He has a hard time going to sleep at night.  (Id. at 316.)  He was prescribed a medication to help but his insurance will not cover it.  (Id.)  He goes to bed at approximately 10 o'clock at night but does not fall asleep until midnight.  (Id.)  He wakes up two or three times a night because of nightmares about being burned.  (Id. at 316-17.)

A supplemental hearing was held a few months later for testimony by a vocational expert (VE), Brenda Young, M.A.

At the beginning of the hearing, Plaintiff testified that he had completed the GED classes and had passed the test.  (Id. at 261-62.)

Asked to characterize Plaintiff's past work, Ms. Young testified that his work as a welder was semi-skilled and medium as he performed it and as a carpet installer was semi-skilled and heavy.  (Id. at 262.)  Neither job would have provided any skills that would be transferable to the light or sedentary exertional level.  (Id.)

She was then asked if any of Plaintiff's past work could be performed by a hypothetical worker who could occasionally lift and carry fifty pounds, frequently lift and carry twenty-

five pounds, stand and/or walk for a total of six hours in an eight-hour day with the normally allowed breaks, and sit for the same amount. (Id.) She replied that the welding job as Plaintiff performed it could be done by such a person. (Id.)

If the hypothetical person could stand and/or walk for a total of two hours in an eight-hour day with the normally allowed breaks, could sit for a total of six hours during such a day, could not crawl or climb such things as ladders or scaffolds, and could only occasionally use ramps or stairs, balance, stoop, kneel or crouch, this person could not perform any of Plaintiff's past work. (Id. at 263.) Such a person who was also of Plaintiff's age, education, work experience, and vocational capabilities, could perform entry level work in the sedentary range, including customer service positions and telemarketer jobs. (Id.) There were approximately 5,000 of the first and 4,500 of the second in the St. Louis metropolitan area. (Id.) Such person could also perform sedentary assembly jobs, approximately 2,500 of which existed in the same area. (Id. at 264.)

If the hypothetical person also could do no more than occasional handling and fingering with the nondominant hand, the assembly and customer service jobs would be eliminated. (Id.) The number of telemarketer jobs would be reduced to no more than 400 in the same area. (Id.) Sedentary cashier jobs, of which there were approximately 700 in the St. Louis metropolitan area, might also accommodate such a person. (Id.) For some of these jobs, however, the dominant hand would be toward the customer and this added qualification might reduce the number of available jobs. (Id. at 265.) No standing would be required in the jobs she listed. (Id. at 275.)

Ms. Young further testified that her testimony was consistent with the <u>Dictionary of Occupational Titles</u> (DOT). (<u>Id.</u> at 266.)

Asked by Plaintiff's counsel how greatly the number of jobs would be reduced depending on the use of the dominant hand, Ms. Young replied that the number would depend on how the work station was set up. (<u>Id.</u> at 268.) The number of jobs could be reduced by 50%. (<u>Id.</u>) She had not listened to Plaintiff's testimony. (<u>Id.</u>) She had made no note of whether he had any environmental restrictions on his work activities. (<u>Id.</u> at 271.) If Plaintiff had to be in an environment with an ambient temperature of 60 to 65 degrees, he could not perform his past work or the jobs she earlier listed because that temperature was colder than an office setting would be. (<u>Id.</u> at 272-73, 273-74.)

The jobs would also be eliminated if he had limited function in his nondominant, left hand "due to grip and weakness and numbness, tingling" and some limited use of his dominant right hand, including numbness after five to ten minutes of use, that would interfere with his fine motor movement. (<u>Id.</u> at 273.) If a person had to miss four days of work a month, this person would not be able to maintain a job. (<u>Id.</u> at 274.)

After the supplemental hearing, Ms. Young was asked to respond to written interrogatories submitted by the ALJ and by Plaintiff's counsel.

The ALJ asked her to assume a worker who could (i) occasionally lift twenty-one to fifty pounds and frequently lift ten; (ii) sit, stand, or walk for four hours in an eight-hour workday; (iii) sit or stand for one hour without interruptions; (iv) walk for thirty minutes without interruptions; (v) frequently reach in all directions; (vi) handle, finger, feel, push/pull

with the arms, and operate foot controls; (viii) never kneel or crawl; (ix) occasionally climb ramps, stairs, ladders, scaffold; and (x) occasionally balance, stoop, or crouch. (Id. at 108.) This person could not be exposed to humidity, wetness, and extreme heat or be more than occasionally exposed to extreme cold. (Id.) Ms. Young replied that this person could not perform Plaintiff's past work but could perform other work, i.e., security guard and retail salesperson. (Id.) These two jobs existed in significant numbers in the St. Louis metropolitan area. (Id.) If this person also had to change positions at no longer than forty-five minute intervals, this person could not work at Plaintiff's past work or any other job. (Id. at 109.)

Plaintiff's counsel asked Ms. Young to assume a worker of Plaintiff's age, education, and work experience with the limitations of the ALJ's described hypothetical person, including the need to change positions, and who had to keep his body temperature[2] at approximately 65 degrees. (Id. at 102.) The added limitations did not change her response that there was no work a person with the same limitations described in the ALJ's second hypothetical could perform. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers, and functional assessments.

---

[2]At the supplemental hearing, the reference was to the ambient temperature in the workplace, not to body temperature.

When applying for DIB and SSI, Plaintiff completed a Function Report. (Id. at 136-42.) Asked to describe his day, he reported that he wakes up at approximately 8:00 a.m., eats breakfast, takes his medicine, does a little housework, watches television or movies, eats lunch, does his exercises, showers, puts medicine on his sores and lotion on the healed areas, eats dinner, watches television, and goes to bed around 10:30 p.m. (Id. at 136.) He does not take care of anyone else or of any animals. (Id. at 136A.) His burns make it hard for him to get comfortable. (Id.) When dressing, he needs help with his socks and with putting lotion on his back. (Id.) He will make breakfast and lunch; his mother makes dinner. (Id. at 137.) He folds laundry, puts away the dishes, and cleans up after himself. (Id.) He needs to be reminded to do these things. (Id.) He drives, but his license has been suspended for five years due to a driving while intoxicated charge. (Id. at 138.) He goes shopping once a week for food and personal items. (Id.) As he described in his testimony, he watches television and movies, visits neighbors, and goes to church on Sunday. (Id. at 139.) He cannot go out in the sunlight. (Id. at 140.) His impairments affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and use his hands. (Id.) He can walk no farther than 500 feet before having to stop and rest for 5 minutes. (Id.) He can pay attention "all the time" and can follow written or spoken instructions. (Id.) He gets along well with authority figures. (Id. at 141.) He handles stress okay but does not like changes in routine. (Id.) Fires scare him. (Id.) He has always worn glasses but currently also uses a brace and cane. (Id.)

Plaintiff also completed a Disability Report. (Id. at 151-57.) He is 5 feet 11 inches tall and weighs 170 pounds. (Id. at 151.) His ability to work is limited by the third degree

burns over 56% of his body.  (Id.)  In addition to not being able to go outside for six months, his scar tissue limits his ability to move.  (Id. at 152.)  The burns occurred on April 29, 2005.  (Id.)  He last worked on December 31, 2003, when his employer lost a contract.  (Id.)  He completed the eleventh grade and had not attended special education classes.  (Id. at 156.)

On a Work History Report, Plaintiff listed one job as a carpet layer, one as an iron worker, and three as a welder.  (Id. at 143-50.)  His longest-held job was as a welder from 1993 to 1996.  (Id. at 143.)  There was no job listed for 2000, 2001, or 2002.  (Id.)  The last year in which he worked was 2004.  (Id.)  An earnings report listed annual earnings in the years 1985 to 2000 and 2003.  (Id. at 92.)  His highest annual earnings were $17,246.25, in 1999.  (Id.)  His earnings the previous two years did not exceed $5,500 and in the following year, 2000, were $568.00.  (Id.)  He earned $4,757 in 2003.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order.

Plaintiff was hospitalized at St. John's Mercy Medical Center burn unit from April 29, 2005, to June 10, 2005.  (Id. at 193-95, 224-54.)  The admitting diagnosis was burns over approximately 56% of his total body surface area, including second and third degree burns to the face, neck, both upper and lower extremities, and his trunk.  (Id. at 225.)  During his hospitalization, he underwent five skin grafts.  (Id. at 227-28, 231-40.)  The discharge diagnosis was burns over approximately 40% of his total body surface area.  (Id. at 225.)

On discharge from the burn unit, Plaintiff was admitted to the rehabilitation unit because he was having difficulty with his gait and mobility.  (Id. at 214-23, 227.)  A

psychological evaluation was conduced the same day. (<u>Id.</u> at 219-20.) He was oriented times three. (<u>Id.</u> at 219.) He reported having some depression, but explained that it was getting better. (<u>Id.</u>) He had had periods of extreme depression due to the pain and burns. (<u>Id.</u>) He no longer had any suicidal thoughts or plan. (<u>Id.</u>) He was on an antidepressant. (<u>Id.</u>) The diagnosis was major depression due to medical issues. (<u>Id.</u>)

After two weeks in the rehabilitation unit, Plaintiff was stable and ambulating better with use of a cane and cast. (<u>Id.</u> at 215.) His pain was controlled with medication, including methadone and Percocet. (<u>Id.</u> at 215-16.) He was discharged home. (<u>Id.</u> at 215.) He was to keep his legs elevated when sitting. (<u>Id.</u> at 216.)

When Peter M. Rumbolo, M.D., one of the doctors who had treated Plaintiff when he was in the burn unit, saw Plaintiff on July 6 he described him as having "excellent healing of his burn wounds." (<u>Id.</u> at 211.) He had several open areas that would "heal with time." (<u>Id.</u>) "He [was] doing therapy and walking steps at home." (<u>Id.</u>) He was weaning off the methadone and other medications. (<u>Id.</u>) He was given a prescription for Percocet and told to wean of it as well. (<u>Id.</u>) Dr. Rumbolo noted that Plaintiff needed to be fitted with a Jobst garment[3] but that the family was going to wait until they had Medicaid coverage. (<u>Id.</u>)

A nursing note dated July 20 reads that Plaintiff was having trouble sleeping. (<u>Id.</u> at 208, 210.) Jonathan Pollack, M.D., another doctor who had treated Plaintiff in the burn unit, described him that same day as doing well and having healed in the entire burned area, which

---

[3]A Jobst garment is a pressure-gradient burn garment used to control hypertrophic scars. O. van Straten, <u>Pressure garments in the control of hypertrophic scarring and rehabilitation of the burn patient</u>, <u>http://www.ncbi.nlm.nih.gov/pubmed/6735704</u> (last visited Jan. 19, 2011).

was more than 40% of his total body surface area.  (Id. at 209.)  He had a tight band over his left axilla, but was able to reach over his head.  (Id.)  The burn wounds on his chest, legs, and back were well-healed and had no signs of infection.  (Id.)  He had a small open area over his left knee with no sign of a significant infection.  (Id.)  He was given a prescription for Percocet and Lexapro.  (Id.)  He was also prescribed a Tubigrip.[4]  (Id.)  Dr. Pollack noted that Plaintiff might have difficulty getting a Jobst garment.  (Id.)

When Dr. Pollack saw Plaintiff on August 16 he described him as doing well.  (Id. at 206.)  He noted that Plaintiff had been unable to obtain a Jobst garment and was not wearing hi Tubigrip.  (Id.)  He was taking Percocet and doing therapy at home.  (Id.)  He was able to reach his arm over his head.  (Id.)  Dr. Pollack gave him a prescription for Percocet and not for Lexapro, noting that Plaintiff was not seeing a psychiatrist but might need to in the future.  (Id.)  Plaintiff was to wear his Tubigrip as instructed.  (Id.)

Plaintiff went to the office of the plastic surgeon on August 30, complaining of severe pain and requesting a prescription for Percocet.  (Id. at 208.)  He was given a prescription for Vicodin.  (Id.)  The next day, he returned, reporting that the Vicodin was not helping.  (Id.)  He was given a prescription for Percocet and told to use it sparingly.  (Id.)

Plaintiff was wearing his Tubigrip when he next saw Dr. Pollack, on September 14.  (Id. at 205.)  He had not yet obtained a Jobst garment.  (Id.)  He was doing therapy at home and was more active.  (Id.)  He could completely bend his legs, reach both arms over his head, and extend both knees.  (Id.)  He still had some numbness and tingling in his left hand and

---

[4]Tubigrip is an elastic garment for tissue support for, inter alia, post-burn scarring.

pain and hypertrophic scarring around his neck. (<u>Id.</u>) He was given another prescription for Percocet, "likely . . . his last," and told that use of the Jobst garment was imperative. (<u>Id.</u>) Dr. Pollack also cautioned him to monitor his left upper extremity and hand because he might have some carpal tunnel disease. (<u>Id.</u>)

Plaintiff saw David A. Smith, M.D., on September 20. (<u>Id.</u> at 202.) Dr. Smith noted that Plaintiff's only known medical problems were those resulting from the burns he sustained on April 29. (<u>Id.</u>) On examination, Plaintiff had a full range of motion in his upper and lower extremities. (<u>Id.</u>) His neurological makeup was "grossly intact" except for decreased sensation in his left hand due to the burns. (<u>Id.</u>) He had scars on both his upper and lower extremities. (<u>Id.</u>)

On October 20 and again on October 25, Plaintiff consulted Dr. Smith about painful ear infections. (<u>Id.</u> at 201.)

Dr. Pollack saw Plaintiff eleven days after the carpal tunnel release of his left hand.[5] (<u>Id.</u> at 204.) Plaintiff still had some numbness and tingling, but it was improving. (<u>Id.</u>) Plaintiff was to return in approximately one week for suture removal. (<u>Id.</u>) Because he was not wearing a splint, he was not to lift anything heavier than five pounds. (<u>Id.</u>)

Plaintiff returned to Dr. Smith on January 9, 2006, complaining of headaches for the past two weeks and muscle spasms. (<u>Id.</u> at 200.) The headaches tended to be present in the morning when he woke up and were not relieved by over-the-counter medications. (<u>Id.</u>) He drank coffee and two to three soft drinks a day. (<u>Id.</u>) He was advised to discontinue the

---

[5]The records of that release were not before the ALJ.

caffeine and was prescribed Imitrex and Midrin, both for the relief of headache pain. (Id.) A subsequent note reads that his insurance would not cover any headache medication. (Id.)

When Plaintiff saw Dr. Smith on January 23, he reported that the medications relieved his headaches but caused him heartburn. (Id. at 198.) He was diagnosed with cephalalgia (headache[6]) and gastroesophageal reflux disease (GERD) and prescribed Zantac for the heartburn and Midrin for the headache pain (Id. at 197-98.)

In addition to the foregoing records from Plaintiff's treating health care professionals, the ALJ had before him functional assessments of Plaintiff and reports of consultative examinations.

In August 2005, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by an agency non-medical consultant, S. Falter. (Id. at 128-35.) The primary, and only, diagnosis was third degree burns. (Id. at 128.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 129.) His ability to push or pull was not otherwise limited. (Id.) He had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 130-32.)

In September 2005, Joan Singer, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff. (Id. at 114-27.) Plaintiff was described as having an affective disorder, major depression due to medical issues, that was not severe. (Id. at 114, 117.) This

_____

[6]See Stedman's Medical Dictionary, 310 (26th ed. 1995).

disorder resulted in mild restrictions of activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Id. at 124.) Dr. Singer noted that Plaintiff had not alleged depression as a basis for disability and had reported that his depression did not keep him from working. (Id. at 126.)

Pursuant to his applications, Plaintiff underwent two consultative examinations. One was a physical examination performed by Llewellyn Sale, Jr., M.D., in August 2007. (Id. at 172-83.) Plaintiff reported that two of his major problems were excessive perspiration with temperatures as hot as 75 degrees and being very uncomfortable when it was cold. (Id. at 172.) Although he drank lots of fluids, he had symptoms of dehydration when the temperature was over 75 degrees. (Id. at 172-73.) He was "super sensitive" to direct sun. (Id. at 173.) He lived with his family and had no medical attention for the past year due to no insurance. (Id.) His medical problems included daily headaches relieved by ibuprofen and excessive epigastric discomfort for which he took antacids. (Id.) His main discomfort was in his left lower extremity, knee, and hip due to surgery on the hip joint, extensive skin grating, and loss of muscle tissue in his left lower extremity, particularly in the thigh and knee. (Id.) He also had numbness in the thumb and fourth and fifth fingers of his right hand. (Id.) He smoked one to one and one-half packs of cigarettes a day, and had done so for fifteen years. (Id.) He had had alcohol detoxification treatment in 2002 followed by two years in Alcoholics Anonymous (AA). (Id.) He no longer drank. (Id.) He had used marijuana and methamphetamine, but had not used either for four years. (Id.) On examination, he had a good range of motion in his neck, no tenderness in his back, no swelling or bruising in his

extremities. (Id. at 173-74.) His gait was normal without the use of an assistive device. (Id. at 174.) He could walk on his heels and toes, squat to 70 degrees, and adequately flex his knees. (Id.) He had normal fine finger control. (Id.) The muscle strength was 4/5 in his right hand grip and right upper and lower extremities. (Id. at 174, 175, 176.) In his left hand grip and left upper and lower extremities, his muscle strength was 5/5. (Id.) He could fully extend each hand, make a fist with either hand, and oppose the fingers on each hand. (Id. at 175.) On straight leg raising, he had pain in his left hip.[7] (Id. at 174, 176.) He had a full range of motion in his shoulders, elbows, wrists, and cervical spine. (Id. at 175, 176.) His range of motion in his lumbar spine was slightly limited on lateral flexion. (Id. at 176.) Dr. Sale noted that Plaintiff had a "[r]emarkable appearance with post-burn skin grafts and scars over the trunk and extremities, particularly the lower extremities but also some over the upper extremities as well." (Id. at 174.)

Dr. Sale assessed Plaintiff as being able to occasionally lift or carry twenty-one to fifty pounds and frequently carry up to ten pounds and noted that such limitations were due to the abnormal sweating which activity caused. (Id. at 177.) Plaintiff could sit or stand for one hour at a time without interruptions and could sit, stand, or walk for a total of four hours each in an eight-hour work day. (Id. at 178.) He could walk for no longer than thirty minutes without interruption. (Id.) He must change position every thirty to forty-five minutes because

---

[7]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

of his lower left extremities.  (Id.)  He did not need a cane to ambulate.  (Id.)  Plaintiff could frequently (one-third to two-third of a work day) reach, handle, finger, feel, and push/pull with either hand.  (Id. at 179.)  He could also frequently operate foot controls with either foot.  (Id.)  Because of his knees, he should never kneel or crawl and should only occasionally climb, balance, stoop, and crouch.  (Id. at 180.)  He had no hearing or vision impairments.  (Id.)  Because of excessive sweating, he had environmental limitations of having to avoid humidity, wetness, and extreme heat.  (Id. at 181.)  Also, he should only occasionally be exposed to extreme cold.  (Id.)

The other consultative examination was a psychological one performed by L. Lynn Mades, Ph.D., a licensed psychologist.  (Id. at 184-92.)  Plaintiff informed the psychologist that he had felt depressed after being released from the hospital and was placed on antidepressants.  (Id. at 184.)  His mood was better; however, he still tended to avoid some social situations.  (Id. at 184-85.)  He had seen a psychiatrist when he was in the hospital but had not had any psychiatric treatment since.  (Id. at 185.)  He had last drank alcohol two years earlier.  (Id.)  He had then been drinking six to twelve beers twice a week.  (Id.)  He had also used marijuana and methamphetamine.  (Id.)  The former he had last used four years ago; the latter eight years.  (Id.)  He had been in treatment for alcohol abuse in 2002 and had remained sober for approximately one year afterwards.  (Id.)  He attends AA occasionally; he does not have a sponsor.  (Id.)  He had had "'a few drinks'" on the day he was burned.  (Id.)

On examination, Plaintiff was generally cooperative and pleasant.  (Id. at 186.)  His expression was alert; his eye contact was good.  (Id.)  His posture and gait were within normal

limits. (Id.) He was spontaneous, coherent, relevant, and logical. (Id.) His speech was normal in rate and rhythm and lacking in tangents, flight of ideas, or perseveration. (Id.) His mood was euthymic; his affect was full and generally appropriate. (Id.) There were no apparent mood disturbances, preoccupations, thought disturbances, perceptual distortions, or auditory or visual hallucinations. (Id.) Reality testing was adequate; flow of thought was logical and sequential. (Id.) Suicidal or homicidal ideation was denied. (Id.) Plaintiff was oriented in all spheres. (Id. at 187.) His insight and judgment were "[s]lightly limited." (Id.) He displayed an ability to maintain "adequate" attention and concentration and appropriate persistence and pace. (Id. at 187-88.) The diagnosis was alcohol, cannabis, and amphetamine abuse, all in sustained full remission according to Plaintiff. (Id. at 188.) Dr. Mades rated Plaintiff's Global Assessment of Functioning score as 80,[8] noting that Plaintiff did not appear to be depressed and presented no evidence of mood or thought disturbance or of any current psychological impairment. (Id.) She concluded that his abilities to understand, remember, and carry out instructions; to interact appropriately with supervisors, co-workers, and the public; and to respond to changes in the routine work setting were not affected by his impairment. (Id. at 190-91.) She found Plaintiff had no current psychological limitations. (Id. at 191.) His prognosis was "fair." (Id. at 188.)

---

[8]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008). A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR at 34.

## The ALJ's Decision

After outlining the Commissioner's five-step sequential evaluation process, the ALJ first found that Plaintiff met the requirements for DIB through September 30, 2005, and that he had not engaged in substantial gainful activity at any relevant time. (Id. at 12-13.) The ALJ next found at step two that Plaintiff had severe impairments of status post second and third degree burns of the face, neck, bilateral upper extremities, trunk, and bilateral lower extremities; status post multiple procedures with grafts and surgery on the left hip; and status post carpal tunnel release. (Id. at 14.) These impairments, singly or in combination, did not, as would be required for a favorable finding at step three, meet or medically equal an impairment of listing level severity. (Id.)

Before addressing the question at step four of whether Plaintiff could return to his past relevant work, the ALJ assessed his residual functional capacity (RFC) and found it to be an ability to occasionally lift twenty-one to fifty pounds; frequently lift ten pounds; sit, stand, or walk each for up to four hours in an eight-hour workday; sit or stand each for one hour without interruption; walk for thirty minutes without interruption; frequently handle, finger, feel, push/pull with either or both arms, and reach in all directions; operate foot controls with either or both feet; occasionally climb ramps, stars, ladders, and scaffolds; occasionally balance, stoop, or crouch; and be exposed only occasionally to extreme cold. (Id.) He did not have the RFC to be exposed to humidity, wetness, and extreme heat. (Id.)

After summarizing Plaintiff's testimony, the ALJ concluded that his "medically determinable impairments could reasonably be expected to produce some of the alleged

symptoms" but not of the intensity, duration, and extent described by Plaintiff. (<u>Id.</u> at 14-15.) Specifically, the medical evidence, summarized in detail by the ALJ, was of extensive treatment immediately after Plaintiff's burn injuries and for the next few months. (<u>Id.</u> at 15-18.) Following this period, there was relatively little medical treatment. (<u>Id.</u> at 18.) There was no further surgery or physical therapy, no treatment at a pain clinic or injections for pain relief, no recent emergency room visits, and no hospitalizations. (<u>Id.</u>) Also, there was no psychiatric hospitalizations or any treatment by any mental health professional. (<u>Id.</u>) This lack of consistent treatment was inconsistent with Plaintiff's allegations of severe and disabling symptoms. (<u>Id.</u>) Moreover, there was "no persuasive evidence that [Plaintiff] has been refused medical treatment due to an inability to pay." (<u>Id.</u>) He has Medicaid. (<u>Id.</u>)

Also, there were no opinions by treating or examining physicians that Plaintiff was disabled or had greater limitations than those listed in his RFC. (<u>Id.</u>)

Plaintiff had described fairly limited daily activities; however, this description was unpersuasive given that it could not be objectively verified and, even if accurate, was not attributable to his medical condition. (<u>Id.</u>) Additionally, Plaintiff's use of medication was not indicative of a more limited RFC. (<u>Id.</u>) He was taking only over-the-counter medication and had not alleged, or complained of, any side effects from medication. (<u>Id.</u>)

Plaintiff's work history did not weigh in favor of his credibility. (<u>Id.</u> at 19.) He worked sporadically and his earnings did not reflect a strong motivation to work. (<u>Id.</u>)

Another factor detracting from Plaintiff's credibility was his appearance and demeanor at the hearing. (<u>Id.</u>) Both lacked any display of pain, discomfort, or an unusual degree of

perspiration.  (Id.)  He had no apparent difficulty understanding or responding to questions. (Id.)

With his RFC, Plaintiff was, however, unable to perform his past relevant work.  (Id.)

With his RFC, age, and limited education, he was able to perform jobs that exist in significant numbers in the national economy.  (Id.)  Such jobs were described in the VE's credible testimony.  (Id. at 20-21.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R.

§§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without

obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Id.** (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past

relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'"  **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to

determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because (1) the ALJ's analysis of his RFC did not include his migraine headaches and problems with his right hand, body temperature, and breathing, (2) the ALJ did not properly evaluate his credibility, and (3) the hypothetical question posed to the VE was inaccurate and not supported by the medical evidence.

As noted above, Plaintiff has the burden at step four of establishing his RFC.  See **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004).  On the other hand, the ALJ has the responsibility of assessing that

RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738.

The first impairment Plaintiff focuses on is his headaches.[9]  In November 2006, Plaintiff testified that he had headaches[10] lasting for four to six hours that were only partially relieved by over-the-counter medication.  He had seen a doctor about the headaches ten months earlier and had reported to that doctor that the prescribed medication relieved the headaches but gave him heartburn; he was prescribed a medication for the heartburn.  Ten months after the testimony, he told a consulting physician, Dr. Sale, that he took over-the-counter medication for his daily headaches.  Although the ALJ did not render his decision for thirty-two months after Plaintiff's visit to his treating physician, there is no additional medical evidence relating to treatment of Plaintiff's headaches.  Thus, the last medical evidence before the ALJ is that Plaintiff's headaches were relieved by prescribed medication.  "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" **Brown v. Astrue**, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).

Regardless, Plaintiff contends that the ALJ fatally failed by not specifically addressing whether his headaches are severe impairments.  The ALJ's "RFC assessment must include a

_____

[9]Throughout his supporting brief, Plaintiff refers to his burns and subsequent hospitalization. He does not argue, however, that the burns themselves resulted in any disabling impairment.  Rather, he contends that the consequences of those burns, e.g., problems with body temperatures, have rendered him disabled.

[10]Plaintiff characterizes his headaches as migraines; this characterization does not appear in the medical records.

narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." S.S.R. 96-8p, 1996 WL 374184, * 7 (Soc. Sec. Admin. July 2, 1996). In the instant case, the ALJ summarized in detail the medical and nonmedical evidence, including Plaintiff's testimony that he took ibuprofen and Tums and that he had headaches two or three times a week. "Moreover, '[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.'" **Wildman v. Astrue**, 596 F.3d 959, 966 (8th Cir. 2010) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

And, although the ALJ did not present his RFC findings in bullet points with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p. Rather, the concern of Ruling 96-8p is "that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting Ruling 96-8p). The ALJ did not, however, overlook any of Plaintiff's limitations he found to be severe. See **Owen**, 551 F.3d at 801-02 (finding that ALJ did not err in not including alleged impairment in RFC when evidence did not support claimant's description of restrictions allegedly caused by impairment).

Plaintiff next argues that the ALJ erred by not incorporating in his RFC problems with his right hand. The ALJ did include certain limitations, i.e., being able to handle, finger, and feel no more than two-thirds of the time. These limitations echo Dr. Sale's assessment that Plaintiff had the capacity to frequently reach, handle, finger, feel, and push/pull with either hand, including the right hand in which his grip strength was 4/5, and could extend that hand,

make a fist.  Similarly, Dr. Sale and the ALJ imposed certain environmental limitations on

Plaintiff; these limitations, including avoiding humidity, wetness and extreme heat reflect the

credible restrictions on body temperature.  The ALJ also included limitations on Plaintiff

climbing and walking that accommodated any shortness of breath established by the record.[11]

Thus, the ALJ included those restrictions in his RFC he found to be credible and supported

by the evidence.  An integral part of the ALJ's determination of a claimant's RFC is an

evaluation of his credibility.  See **Wagner**, 499 F.3d at 851, **Dukes**, 436 F.3d at 928.  An ALJ

need not include in his RFC determination allegations which he has found not to be credible.

**Wildman**, 596 F.3d at 969.

Plaintiff argues, however, that the ALJ erred in finding that he was not fully credible.

Specifically, he contends the ALJ erred when unfavorably considering his demeanor at the

hearing, his work history, and his daily activities.[12]

The ALJ found that Plaintiff's appearance and demeanor at the hearing detracted from

his credibility because he did not display any pain, discomfort, or an unusual degree of

perspiration – symptoms which Plaintiff contended precluded him from working.  "The ALJ's

personal observations of the claimant's demeanor during the hearing is completely proper in

making credibility determinations."  **Johnson v. Apfel**, 240 F.3d 1145, 1147-48 (8th Cir.

---

[11]As noted by the Commissioner, Plaintiff did not complain of shortness of breath to any health care provider and specifically denied in the hospital experiencing such.

[12]Plaintiff also notes that he took narcotic pain medication for at least six months.  A disability must have lasted, or be expected to have lasted, at least twelve continuous months to qualify for DIB or SSI.  See **Barnhart v. Walton**, 535 U.S. 212, 217, 222 (2002).

2001). See also **Smith v. Shalala**, 987 F.2d 1371, 1375 (8th Cir. 1993) (observation by ALJ that claimant had not appeared uncomfortable during hearing was properly considered as distracting from claimant's credibility).

The ALJ also correctly considered Plaintiff's poor work record as detracting from his credibility. A *consistent* work record supports a claimant's credibility, see **Hutsell v. Massanari**, 259 F.3d 707, 713 (8th Cir. 2001); conversely, an inconsistent work history does not, see **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 581 (8th Cir. 2002). See also **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (affirming ALJ's adverse credibility decision based in part on claimant's poor work history, including an absence of earnings at a level indicating substantial gainful activity even when not allegedly disabled).

In the 20 years between Plaintiff's first year of employment, at the age of 16 years, and his alleged disability onset date of April 2005, the longest job Plaintiff had held was for three years. See **Wildman**, 596 F.3d at 968-69 (claimant's sporadic work history detracted from credibility); **Juszczyk**, 542 F.3d at 632 (claimant's record of being in and out of work detracted from credibility); **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (claimant's erratic work history, including multiple jobs held for very short periods of time, detracted from credibility). He did not list a job in three consecutive years, 2000,[13] 2001, and 2002. See **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008) (sporadic work history

_____

[13]He did have annual earnings that year, however, of $568.00 The discrepancy is not explained.

of claimant who had no reported earnings in seven of nineteen years detracted from credibility). His highest annual earnings were $17,246.25, averaging $1,437.00 a month. His next highest, $12,197, were at approximately one-third less. Plaintiff notes that his earnings records show he had ten years in which he earned more than $5,000 a year. Given that monthly earnings had to average more than $500 from January 1990 to June 1999 and $700 from July 1999 to June 2000 to qualify for substantial gainful activity, see 20 C.F.R. § 416.974(b)(2)(i)(Table 1),[14] his earnings record does not reflect a motivation to work. See **Ramirez**, 292 F.3d at 581.

Plaintiff argues in his reply brief that the Commissioner contends that he is not credible because he was laid off from work in 2003. This argument misapprehends the Commissioner's position. Leaving work for a reason other than an alleged impairment, as Plaintiff did, is a relevant consideration when evaluating a claimant's credibility. See **Medhaug v. Astrue**, 578 F.3d 805, 816-17 (8th Cir. 2009); **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005).

At the hearing, Plaintiff described his activities as helping his mother with the housework, trying to do yardwork, watching television, playing card with his neighbors, going to church on Sundays, and attending GED classes. When applying for DIB and SSI, he

---

[14]Plaintiff's statement in his reply brief that the ALJ's description of his work history as including "poor earnings" "assumes that an individual without a high school diploma was eligible for high income jobs" is a mischaracterization of the ALJ's decision. Plaintiff did not hold any one job for long, had earnings that greatly varied in amount, and had years in which his earnings did not qualify as substantial gainful activity or in which there were none. The ALJ did not err in considering this record as a poor work history.

reported that he did some housework, fixed breakfast and lunch, watched television, visited neighbors, and attended church on Sundays. The ALJ found these activities to be limited, but not attributable to Plaintiff's medical condition. This finding is supported by the record, including the absence of any restrictions placed on Plaintiff by his physicians that would prevent him from engaging in activities other than those precluded by his RFC. See **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record). See also **Jones**, 619 F.3d at 975 (affirming adverse credibility determination of ALJ who found claimant's activities to be limited on a "self-imposed voluntary basis" rather than due to her medical condition); **Vossen**, 612 F.3d at 1017 (rejecting claimant's argument that ALJ "improperly discredited his testimony based on his performance of minor activities of daily living"); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (finding that record indicated that claimant was "generally able to care for himself"; although claimant was "not very active," he was able to complete chores when asked).

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ's adverse credibility findings are so explained and supported. Plaintiff's challenge to them is without merit.

Plaintiff next challenges the hypothetical questions asked the VE.

As noted above, the Commissioner may meet his burden at step five by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).

For the reasons set forth above, the ALJ properly excluded any additional restrictions related to headaches, Plaintiff's use of his right hand, and any problems with body temperatures and breathing.

Plaintiff further argues that the ALJ fatally erred in ignoring limitations found by Dr. Sale and included in a hypothetical question posed by her attorney to the VE. That question included a restriction of sitting, standing, and walking "*for a total of 4 hours in an 8 hour day*." (R. at 104.) (Emphasis added.) The ALJ's RFC included an ability "to sit, stand, or walk *(each)* for up to 4 hours in an 8-hour day." (Id. at 14.) (Emphasis added.) This ability mirrors the assessment of Dr. Sale. (See id. at 178.) Dr. Sale did not, as reflected in Plaintiff's hypothetical, find that Plaintiff had the ability to only sit, stand, and walk for a *total* of four hours.

In her reply brief, Plaintiff contends the ALJ also erred by not including in his hypothetical the need found by Dr. Sale for Plaintiff to change positions every thirty to forty-five minutes. Plaintiff further defines this need as requiring that he change between sitting, standing, and walking. The ALJ did, however, include in his RFC and in his written interrogatory to the VE that Plaintiff could only sit or stand without interruption for one hour and walk without interruption for thirty minutes. Thus, the ALJ did include a need to change positions in his hypothetical question.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days from this date** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of January, 2011.